UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDGAR LOPEZ FRAUSTO[1], | Case No.: 19cv544-BAS(LR) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION FOR ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS** |
| ANDRE GONZALES, Acting Warden, | |
| Respondent. | **[ECF No. 20]** |

This Report and Recommendation is submitted to the Honorable Cynthia A. Bashant, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rules 72.1(d) of the United States District Court for the Southern District of California.  On March 22, 2019, Petitioner Edgar Lopez Frausto, a state prisoner then proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C.

---

[1] The Court notes that, in Petitioner's original federal Petition and in the state-court proceedings, his last name appears as Lopez Frausto.  (ECF No. 1; see also Lodgment 62; Lodgment 73.)  In contrast, in the Amended Petition, Answer, Traverse, and Sur-Reply, his name appears as Frausto Lopez.  (ECF Nos. 20, 29, 31, 33.)  Although the captioning is inconsistent, the docket makes clear that all filings pertain to the same Petitioner.  Accordingly, the Court will refer to him as Lopez Frausto, or as Petitioner.

§ 2254 by filing a Petition for Writ of Habeas Corpus ("Petition").  (ECF No. 1.)  The Court stayed the matter on July 31, 2019, pending resolution of a related habeas petition in the San Diego County Superior Court.  (ECF No. 9.)  After Petitioner retained counsel, Petitioner filed his Amended Petition for Writ of Habeas Corpus ("Amended Petition") on July 3, 2025, which is the operative pleading in this case.  (ECF No. 20.)  On November 7, 2025, Respondent filed an Answer to Petitioner's Amended Petition.  (See ECF No. 29.)  Petitioner thereafter filed a Traverse on December 5, 2025, and Respondent filed a Sur-Reply on January 14, 2026.  (ECF Nos. 31, 33.)

This Court has considered the Amended Petition, Answer, Traverse, Sur-Reply, and all supporting documents filed by the parties.  For the reasons set forth below, the Court **RECOMMENDS** that Petitioner's Amended Petition for Writ of Habeas Corpus be **DENIED**.

## I.  FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in People v. Lopez-Frausto, Appeal No. D069241.  (See Lodgment 62.)  This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary.  See 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

*A. General Background*

The Arellano-Felix Organization (AFO) is a drug cartel in Tijuana, Mexico.  The AFO hierarchy consists of leaders, followed by multiple lieutenants, then cells that perform different functions.  The cells have their own names and work semi-independently with their own crews.  A crew consists of individuals who work for a cell leader and perform functions that further the organization.  Cells and their crews specialize in different functions such as kidnapping, drug distribution or paying off public officials.

AFO leaders included Javier Arellano-Felix (El Tigrillo) and his nephew, Fernando Sanchez-Arellano (El Ingeniero).  Jorge Briceno Lopez (Cholo), the brother-in-law of El Tigrillo, led one crew.  Victor Rojas, also known as El Palillo (Toothpick), headed

another crew called Los Palillos. Lopez [Frausto], also known as Tita (Monkey), was a Los Palillos member.

Cholo and Lopez got into a confrontation, resulting in Lopez pulling a gun on Cholo. Cholo demanded that El Palillo hand Lopez over to him. When El Palillo refused, the AFO had him killed, and authorized the murder of the rest of the crew. The Los Palillos group then split from the AFO around 2003 or 2004 and fled to San Diego from Tijuana. El Palillo's brother, Jorge Rojas-Lopez (Palillo), became the leader of Los Palillos. Los Palillos was motivated to avenge the death of El Palillo by hurting people associated with the AFO.

Members of Los Palillos included Lopez, his brother Ponciano Lopez-Frausto (Pelon), Palillo, Jorge Altamirano-Lopez (Chuckie), Hector Altamirano-Lopez (Teran), Jesus Gonzalez-Trujillo (Compadre), Armando Rodriguez (Chipo), Jorge Moreno (Homie), and Guillermo Moreno (Memo). The group also associated with men from the "Cuban Mafia" in another city, including Jhanmay Molina-Perez and Jose Olivera-Beritan (Chino). An expert opined that Los Palillos is a criminal street gang whose primary activities included drug trafficking, kidnapping and murder. The number of people in Los Palillos ranged from three to 15 or 20. The motivating factors behind crimes committed by Los Palillos include greed, revenge and financial gain.

*B. Unsolved Murders*

In August 2004 police were notified of a parked Dodge Caravan that smelled and had something red running out of the vehicle. Inside the van were three bodies. The three victims were later identified as Teodulo Andrade-Espinoza, Jaime Gomez-Coronado and Guadalupe Herrera-Becerra. Andrade-Espinosa died of a gunshot wound to his abdomen, while Gomez-Coronado and Herrera-Becerra died of asphyxiation after having a sock stuffed in their mouths and their heads wrapped in duct tape.

In early August 2005 police found a body, later identified as Francisco Javier Olguin-Verdugo dumped on the side of a road in Chula Vista. Olguin-Verdugo died from strangulation. In late August 2005 police found a body, later identified as Camaron, down the side of an embankment in Bonita. All three cases went unsolved and grew cold.

In January 2008 police arrested Memo, a friend of Lopez's. In August 2008 Memo entered into a cooperation agreement with law

enforcement.  Memo admitted [sic] participating in all these murders and implicated Lopez in the murders.

### C. Camaron's Kidnapping and Murder

Camaron was a prominent figure in the AFO.  Camaron's brother, Victor L. (El Pareja), was a lieutenant in the AFO.  In 2005 Camaron and his wife Adrianna C. lived in a home in Bonita.

On August 18, 2005, Adrianna went to Tijuana to run errands.  That afternoon Adrianna called Camaron from a McDonald's in Bonita and had him bring her some cash to purchase dinner.  He arrived in his BMW, gave her $20, and left.  Adrianna purchased the food and went home where she saw Camaron's BMW in the driveway.  Camaron was not there and she was unable to reach him by telephone.

Adrianna later received a call from her brother-in-law, El Pareja, and learned that Camaron had been kidnapped.  Adrianna went to Tijuana to meet El Pareja.  While Adrianna and El Pareja were talking, El Pareja received a call on his radio phone.  Adrianna overheard a voice tell El Pareja, in Spanish, that "they" were going to kill Camaron and to start gathering money.  Adrianna heard Camaron ask El Pareja to pay the money to prevent Camaron's murder.  El Pareja told Adrianna not to talk to anyone and gave her a phone to communicate with him.

Adrianna returned to the United States and reported the kidnapping to the police.  The following night, El Pareja called Adrianna and told her that he had paid the ransom money.  The next day, a detective told Adrianna that Camaron was dead.

The morning of August 20, 2005, Camaron's body was discovered in Bonita down the side of an embankment lying on a blue tarp.  Camaron's hands were bound, he had severe facial stab wounds and burn marks on his body.

An autopsy of Camaron's body revealed numerous petechial hemorrhages in his eyes, which tend to form when strangulation is not total or complete.  He had bruising and blunt force trauma to his eyes and head, consistent with direct impact. Camaron also had burn blisters on his lower neck and upper chest, likely caused by a Taser. Camaron suffered about 13 separate nonfatal impacts to his face and head.  He had four broken ribs likely caused by being struck with a battering ram.

(Lodgment 62 at 3–6.)

## II.  PROCEDURAL BACKGROUND

**A.    Petitioner's Criminal Conviction and Direct Appeal**

On October 23, 2015, a jury convicted Petitioner of first-degree murder (count 6, Cal. Penal Code § 187(a)), kidnapping for ransom with the infliction of great bodily harm (count 5, Cal. Penal Code § 209(a)), and returned true findings on the special circumstances of kidnaping (Cal. Penal Code § 190.2(a)(17)(b)), torture (Cal. Penal Code § 190.2(a)(18)), and criminal street gang activity (Cal. Penal Code § 186.22(b)). (Lodgment 4 at 880–84; Lodgment 42 at 8730–41.)  The trial court declared a mistrial on additional murder charges (counts 1–4) due to juror misconduct.  (Lodgment 4 at 885–87.)  Petitioner was sentenced to two consecutive life terms in state prison without the possibility of parole.  (Lodgment 2 at 522–23; Lodgment 4 at 900–02; Lodgment 49 at 10299–10301.)

A second jury convicted Petitioner of making criminal threats against sheriff's deputies (Cal. Penal Code § 422) while he was awaiting trial for his murder and kidnapping charges.  (Lodgment 1 at 271–73; Lodgment 46 at 9649.)  The trial court sentenced him to sixty years to life.  (Lodgment 1 at 180–83; 284–85; Lodgment 49 at 10288–89.)

Petitioner filed a consolidated appeal from both convictions to the California Court of Appeal, arguing the following with respect to his murder and kidnaping case: (1) the trial court erred by failing to conduct an inquiry after it was advised of potential juror bias; (2) insufficient evidence corroborated the accomplice's testimony; and (3) a rebuttal witness gave improper opinion on the veracity of the accomplice.  (See Lodgment 57 at 40–71.)  Petitioner further argued the following with respect to his criminal threats case: (1) the trial court improperly removed a juror during deliberations; (2) the prosecutor committed misconduct during rebuttal argument by mischaracterizing the presumption of innocence and diluting the burden of proof; and (3) the California Court of Appeal should independently review sealed police personnel records.  (See id. at 73–98.)  On January 26, 2018, the California Court of Appeal found that: (1) the trial court had no *sua sponte*

19cv544-BAS(LR)

duty to inquire regarding the alleged juror misconduct; (2) corroborating evidence supported the accomplice testimony; (3) the rebuttal witness did not improperly vouch for the accomplice's veracity; (4) the trial court did not err in removing a holdout juror during deliberations; (5) the prosecutor did not commit misconduct because there was no reasonable likelihood the jury understood or misapplied the prosecutor's argument; and (6) the trial court did not abuse its discretion when it denied Petitioner's motion. (Lodgment 62 at 17, 24, 25, 49, 55–56.)

On March 7, 2018, Petitioner filed a petition for review in the California Supreme Court, raising the same claims he raised before the state appellate court. (See Lodgment 63; see also Lodgment 57.) The California Supreme Court denied the petition on May 9, 2018. (See Lodgment 64.)

**B.      Petitioner's State Habeas Petitions**

On August 8, 2017, Petitioner filed a habeas petition in the California Court of Appeal, alleging that (1) a juror committed misconduct by lying on her questionnaire and providing other jurors with extraneous information, and (2) trial counsel rendered ineffective assistance by failing to investigate juror misconduct and move for a new trial. (See Lodgment 60.) On January 26, 2018, the California Court of Appeal ordered the prosecution to show cause, returnable before the Superior Court of San Diego County, why the relief requested in the petition should not be granted. (See Lodgment 68.) In response to the order to show cause issued by the California Court of Appeal, on September 16, 2019, the Superior Court conducted a four-day evidentiary hearing and denied the petition on the merits. (See Lodgments 73, 78–79.) On October 13, 2020, Petitioner then sought relief in the California Court of Appeal, which adopted the Superior Court's reasoning and denied the petition on October 30, 2020. (Lodgments

19cv544-BAS(LR)

74–75.)  Finally, Petitioner presented his habeas claims to the California Supreme Court, which denied relief on July 24, 2024.  (See Lodgments 76–81.)

**C.    Petitioner's Federal Habeas Petition**

On March 22, 2019, Petitioner filed his federal Petition in the United States District Court for the Southern District of California.  (ECF No. 1.)  On July 31, 2019, the District Court stayed the federal Petition pending the resolution of Petitioner's state habeas proceedings.  (ECF No. 9.)  On July 3, 2025, Petitioner filed an Amended Petition, the operative pleading, asserting the following: (1) the trial court erred by allowing counsel for the prosecution's principal witness, a cooperating accomplice, to testify regarding her client's credibility, and (2) juror misconduct denied him his right to a fair and impartial jury, based on a juror's association with a rival gang, disclosure of extrinsic evidence during deliberations, and statements during deliberations reflecting bias against Petitioner.  (ECF No. 20-1 at 9.)  On November 7, 2025, Respondent filed an Answer to the Amended Petition arguing that the state courts' denial precludes federal relief.  (ECF No. 29.)  Petitioner filed a Traverse on December 5, 2025, and Respondent filed a Sur-Reply[2] on January 14, 2026.  (ECF Nos. 31, 33.)

## III.  SCOPE OF REVIEW

Petitioner's Amended Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

---

[2]  The Court notes that in the Amended Petition, Petitioner sought habeas relief under 28 U.S.C. § 2254(d)(2).  (ECF No. 20-1 at 45–46.)  However, in the Traverse, Petitioner for the first time advanced a theory of relief under 28 U.S.C. § 2254(d)(1).  (ECF No. 31-1 at 5–9.)  In light of this new theory, the Court invited a Sur-Reply from Respondent.  (See ECF No. 33.)

19cv544-BAS(LR)

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Early v. Packer, 537 U.S. 3, 7–8 (2002). In making this determination, a reviewing federal court must first identify the appropriate state court decision to review. Where there is no reasoned decision from the state's highest court, the reviewing federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 584 U.S. 122, 125–26 (2018); see also Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991) (providing that a reviewing federal court may "look through" to the last reasoned state court decision).

A state court's decision is "contrary to" clearly established federal law if the state court (1) "applies a rule different from the governing law set forth in [United States Supreme Court] cases," or (2) "decides a case differently than [the United States Supreme Court] has done on a set of materially indistinguishable facts." See 28 U.S.C. § 2254(d)(1); Bell v. Cone, 535 U.S. 685, 694 (2002); Williams v. Taylor, 529 U.S. 362, 405–06 (2000). An "unreasonable application" of clearly established federal law occurs where the state court "identifies the correct governing legal principle [from the United States Supreme Court's decisions] but unreasonably applies that principle to the facts of the prisoner's case." Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Id. at 75–76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta,

of [the United States Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

Habeas relief is also available where the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2); see also Wood v. Allen, 558 U.S. 290, 293 (2010). A reviewing federal court will not overturn a state court's decision on factual grounds unless the federal court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El, 537 U.S. at 240; see also Rice v. Collins, 546 U.S. 333, 341–42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473–74 (2007) (explaining that that federal habeas courts "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'").

## IV. DISCUSSION

### A. Habeas Relief is Not Warranted with Respect to Petitioner's Claim that Prosecutor Engaged in Improper Vouching for the Accomplice's Credibility

#### 1. Parties' arguments

In his Amended Petition, Petitioner argues that the prosecution engaged in improper vouching by using accomplice and principal witness Guillermo "Memo" Moreno's defense attorney, Elizabeth Missakian, to vouch for Moreno's credibility. (ECF No. 20-1 at 7.) Petitioner asserts that the prosecutor improperly vouched for Moreno's credibility by eliciting testimony from Missakian regarding how the prosecution would not have entered into a cooperation agreement with Moreno unless they corroborated his statements. (Id. at 14–16.) Petitioner further asserts that the prosecutor elicited Missakian's opinion on Moreno's credibility and her decision to

19cv544-BAS(LR)

advise him to enter into a cooperation agreement based on her dealings with him.  (Id.) Petitioner contends that the prosecutor used Missakian's testimony to cause the jury to infer that (1) the prosecution would not have offered Moreno a cooperation agreement unless it had sufficiently corroborated Moreno's "free talk" statements and determined he was truthful; (2) other evidence, such as airline and utility records, corroborated Moreno's statements; (3) Missakian would not have allowed her client to enter into the agreement unless she believed he was truthful; (4) if Moreno were not telling the truth, law enforcement would not have discovered and exposed that fact; and (5) for these reasons, the jurors should believe Moreno.  (Id. at 17.)  Petitioner states that because Moreno was the key witness at trial, any error affecting his credibility was prejudicial, and the alleged improper vouching therefore violated Petitioner's right to due process under the Fifth and Fourteenth Amendments of the United States Constitution.  (Id. (citing Darden v. Wainwright, 477 U.S. 168, 180–81 (1986).)  Petitioner therefore argues that his state criminal convictions should be vacated pursuant to 28 U.S.C. § 2254 (d)(2).  (Id. at 45–46.)

Respondent contends that the California Court of Appeal rejected Petitioner's appeal on the merits and that the state courts applied the appropriate legal authority to Petitioner's claims, so the relitigation bar applies under 28 U.S.C § 2254(d)(2) and forecloses relief.  (ECF No. 29-1 at 8–9.)   Respondent states that because Petitioner argues that the state court erred in applying the law to the facts, the relitigation bar confines Petitioner to the state court record, where factual findings enjoy a presumption of correctness that bars new evidence.  (Id. at 9 (citing Cullen v. Pinholster, 563 U.S. 170, 183–84 (2011).)  Respondent further maintains that the state appellate court correctly found that there was no evidence in the record relieving the jury of its duty to assess accomplice Moreno's credibility independently, no indication of external corroboration for Moreno, and no opinion from his attorney, Elizabeth Missakian, that he was truthful.  (Id. at 10.)  Respondent contends that these findings are supported by the record, satisfy 28 U.S.C. § 2254(d)(2), and are "now insulated from challenge under 28 U.S.C. §

2254(e)."  (Id.)  Respondent also points out that in his Amended Petition, Petitioner agrees that the state courts applied the appropriate legal authority to his claims as stated in 28 U.S.C. § 2254(d)(1).  (Id. at 9 (citing ECF No. 20-1 at 44–45).)  Finally, Respondent asserts that Petitioner improperly relies on circuit authority because the relitigation bar restricts this Court to authority from the Supreme Court of the United States regarding constitutional claims.  (Id. (citing Thaler v. Haynes, 559 U.S. 43, 47–49 & n.2 (2010).)

Notably, in his Traverse, Petitioner asserts for the first time that the prosecution violated his Fourteenth Amendment right to due process by allowing Missakian to testify about Moreno's credibility, constituting improper vouching contrary to and an unreasonable application of clearly established precedent of the Supreme Court of the United States under 28 U.S.C. § 2254(d)(1).  (ECF No. 31-1 at 5.)  Accordingly, the Court addresses Petitioner's arguments.

### 2. Elizabeth Missakian's testimony

At Petitioner's kidnapping and murder trial, the prosecution called defense attorney Elizabeth Missakian—counsel for accomplice and principal witness Guillermo "Memo" Moreno—as a rebuttal witness.  (See Lodgment 37 at 6158–6212.)  On direct examination, Missakian testified regarding the need for corroboration before entering into a cooperation agreement:

> Q [prosecutor]: What was your understanding as to what needed to occur after the free talk but prior to entering into a cooperation agreement?
> A [Missakian]: I think the primary thing that needed to occur was that the prosecution needed to corroborate my client's statements.
> Q: What's your—how can you explain corroboration? What did you understand that to require?
> A: It requires finding evidence in addition to or to confirm or corroborate what the client says.
> If I say, "I killed John and I dumped his body"—John—John and— "Me and Jane killed John. And we dumped his body at x location," one bit of corroboration might be to go to that location to find out if the body is there. Another might be to talk to Jane.  So you—the prosecution tries to find other

19cv544-BAS(LR)

evidence to see if, in this case, Mr. Moreno's statements could be confirmed or corroborated.
Q: And—
A: It's a test to see if he's telling the truth.
Q: Could that and, in fact, did that include obtaining airline records?
A: Yes.
Q: Utility records?
A: Yes.
[Defense counsel]: Your Honor, I'm going to object to this as outside the province of an expert and is the province—
The Court: I think we're outside of rebuttal.
[Defense counsel]: —of the jury.  Corroboration is a question for the jury.
The Court: Correct.
I'l sustain.  Also, I think—I think it's also outside of what I thought the rebuttal would be.
But keep going.
Q [prosecutor]: The existence of corroboration, without going into the details of what it may have consisted of, was that then an important consideration in your mind as to whether or not there would ultimately be a cooperation agreement with your client and the district attorney's office?
A: Yes.
[Defense counsel]: Once again, that's argumentative.
The Court: Yeah.  Sustained.
Q: Did you take into consideration the existence of corroboration in exploring future cooperation?
[Defense counsel]: Arg—that's outside the province of an expert. It's the province of the jury.
The Court: Okay.  I'm going to sustain.

(Id. at 6186–88.)

Missakian also testified regarding Moreno's commitments and obligations under his cooperation agreement with the prosecution:

Q [prosecutor]: What are his commitments?
A [Missakian]: That he would cooperate fully with law enforcement in their investigation of crimes committed by members of Los Palillos.  That he would provide truthful and complete information to all crimes known to him that had been committed by Los Palillos members.
His most important obligation was to tell the truth at all times while he was testifying and while the case was being investigated.  And he understood that any intentional deviation from the truth would void the agreement and cause

19cv544-BAS(LR)

him to lose all of the benefits.  He also agreed and understood that if he should lie under oath and commit perjury, that he could be charged with perjury.

Q: This obligation to tell the truth, is that something that you discussed with him privately even before meeting—sitting down on August 20th, 2008?

A: Oh yes.

Q: Was that—did that have a certain level of importance to you in entering into an agreement with him?

A: It's of primary importance.

Q: Why?

A: When you enter into a cooperation agreement, if you—what is the point if you're not going to tell the truth? You have to tell the truth during the cooperation agreement.  That's the way you get the benefit.  If you don't tell the truth, and it's found out—and it generally can be found out.  If you don't tell the truth, you could lose the benefit of the plea agreement.  So there is no point to entering into a plea agreement unless you're going to tell the truth.

Q: And are there, in fact, dangers associated with not telling the truth, consequences, potential consequences—

A: Of course.

Q: —if you entered into a cooperation agreement, give information, and then intentionally lie?

A: Yes.  The plea agreement will be void.  Then you're facing all the charges that you were facing before and potentially additional charges.

Q: Was there ever a—oh, and before I move on from that.  It's clear you understood that then; correct?

A: Yes.

Q: Did you make sure that Mr. Moreno understood it as well?

A: Yes.

Q: How did you make sure he understood that obligation to tell the truth?

A: I talked to him about it when I met with him privately at the jail.  I talked to him about it when I met with him privately at the district attorney's office. I emphasized it.  I always emphasize it.  There's no point to doing this unless you're going to tell the truth.

Q: And similarly given his reactions to you, did you form an opinion as to whether or not Guillermo Moreno understood that obligation?

A: I believe he understood it.

Q: Was there—is there any requirement in this agreement that Guillermo Moreno implicate any particular individual in the organization?

A: No.

Q: Other than his name, are there any names in that cooperation agreement that he needs to provide information on?

A: No.  Just—the only information is that he's going to cooperate with law enforcement in the prosecution of crimes committed by members of Los Palillos but no names are mentioned.

Q: Is there any requirement that Guillermo Moreno implicate a certain number of individuals in crimes?

A: No

Q: Is there any obligation that Guillermo Moreno give information about a certain number of crimes themselves?

A: No.

Q: Is there any obligation for Guillermo Moreno to give information about a certain number of murders?

A: No.

Q: In your discussions with your client, did he ever express to you information that led you to believe that Guillermo Moreno felt he had to implicate certain individuals in crimes?

A: No.

[Defense counsel]: I'm going to object.

The Court: Yeah. This is [California Evidence Code section] 352.

(Id. at 6192–95.)

During a sidebar conference, defense counsel objected that the prosecution was making Missakian a "human lie detector."  The court disagreed, observing that the prosecutor never asked whether she believed Moreno was telling the truth.  (Id. at 6195–98.)

### 3.  Analysis

#### a.  Procedural bar

While the purpose of a federal habeas proceeding is to search for violations of federal law, in the context of a prisoner "in custody pursuant to the judgment of a State court," 28 U.S.C. § 2254(d)–(e), not every error justifies relief.  Where the state court has rejected a claim on the merits, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly."  Woodford v. Visciotti, 537 U.S. 19, 24–25 (2002) (*per curiam*); see also Johnson v. Williams, 568 U.S. 289, 293 (2013) (adopting a rebuttable presumption that a federal claim rejected by a state court without being expressly

19cv544-BAS(LR)

addressed was adjudicated on the merits).  Rather, in such cases, 28 U.S.C. § 2254(d) provides restrictions on the habeas court's ability to grant habeas relief based on legal or factual error.  This statute "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Harrington v. Richter, 562 U.S. 86, 102–03 (2011).

To justify habeas relief based on legal error, a state court's merits-based decision must be "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" before relief may be granted.  See 28 U.S.C. § 2254(d)(1).  The Supreme Court has instructed that a state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Lockyer, 538 U.S. at 73 (internal quotation marks omitted).  To show an unreasonable application, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

Here, the California Court of Appeal found that Missakian's testimony was not improper vouching because her testimony explained what was needed for a cooperation agreement and gave examples of potential corroboration.  (Lodgment 62 at 32.)  The appellate court, relying on People v. Bonilla, 41 Cal. 4th 313, 337 (2007), held that while the jury could infer a belief in corroboration, there was no evidence indicating that the jury relied on information outside the record or that it was relieved of evaluating corroborating evidence.  (Id.)  The appellate court also found that Missakian testified about Moreno's obligation to tell the truth, confirmed she discussed it with him, and stated that Moreno understood that duty, but Missakian never opined that Moreno's testimony was truthful.  (Id. at 33.)  Therefore, the state appellate court rejected

Petitioner's claim on the merits.  Accordingly, an application for a writ of habeas corpus shall only be granted if it is subject to the exceptions in 28 U.S.C. § 2254(d)(1)–(2).  See Harrington, 562 U.S. at 98 ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2).").  In his Amended Petition, Petitioner concedes that the California courts applied the correct legal authority and argues that his convictions should be vacated pursuant to 28 U.S.C § 2254(d)(2). (ECF No. 20-1 at 44–45).  Therefore, based on the Amended Petition, this claim does not fall under the "contrary to" clause of 28 U.S.C § 2254(d)(1).

However, in his Traverse, Petitioner argues for the first time that the state court's decision was both contrary to clearly established federal law *and* an unreasonable application of the law to the facts as set forth in 28 U.S.C. § 2254(d)(1).  (ECF No. 31-1 at 5.)  "A Traverse is not the proper pleading to raise additional grounds for relief." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994); see also Collins v. Uribe, 564 F. App'x 343, 343–44 (9th Cir. 2014) (quoting Delgadillo v. Woodford, 527 F.3d 919, 930 n.4 (9th Cir. 2008)) ("Arguments raised for the first time in petitioner's reply brief are deemed waived.").  Because, in his Traverse, Petitioner raises a new theory pursuant to 28 U.S.C. § 2254(d)(1), and Respondent did not address it in its Answer, the Court is justified in treating the new theory as procedurally defaulted.  (ECF No. 29-1 at 9)); Cacoperdo, 37 F.3d at 507 ("In order for the State to be properly advised of additional claims, they should be presented in an amended petition, or . . . in a statement of additional grounds.").

The Court notes that Petitioner clearly requests relief on the ground of improper vouching.  (See ECF No. 20-1 at 14–18; ECF No. 31-1 at 5–9.)  However, it is unclear as to which subsection of 28 U.S.C. § 2254(d) he requests relief.  As discussed above, Petitioner initially raised a claim for relief under 28 U.S.C. § 2254(d)(2), in his Amended Petition, (ECF No. 20-1 at 45–46), but raised a claim under 28 U.S.C. § 2254(d)(1) in his Traverse, (ECF No. 31-1 at 5–9).  In its Answer, Respondent addressed the claim

19cv544-BAS(LR)

pursuant to 28 U.S.C. § 2254(d)(2), and given the theory raised in Petitioner's Traverse, the Court invited a Sur-Reply from Respondent.

In the Sur-Reply, Respondent first argues that Petitioner failed to exhaust his "prosecutorial misconduct" claim, so it is now procedurally barred. (ECF No. 33 at 1.) The Court disagrees and finds that the claim was exhausted on direct appeal to the California Court of Appeal, where Petitioner argued that "the prosecutor elicited testimony that the prosecutor would not have entered into a cooperation agreement with [Moreno] until they corroborated his free talk statements as a test of his truthfulness," which he characterized as improper, and the California Court of Appeal adjudicated that claim. (Lodgment 57 at 66; see also Lodgment 62 at 24–34.) Respondent next argues that the vouching claim fails on the merits. (ECF No. 33 at 2–3.) The Court addresses that argument below.

### b. Vouching

Assuming that Petitioner's improper vouching claim is not barred by 28 U.S.C. § 2254(d), the claim fails on the merits. Petitioner argues that the state court's decision was contrary to clearly established federal law and an unreasonable application of the law to the facts as set forth in 28 U.S.C. § 2254(d)(1). (See ECF No. 31-1 at 5–11.)

This Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In other words, "clearly established Federal law" under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. Id. at 382. In addition, the Supreme Court decision must "squarely address[ ] the issue in th[e] case[;]" otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); see also Carey

19cv544-BAS(LR)

v. Musladin, 549 U.S. 70, 74 (2006) (stating that "federal habeas may be granted [ ] if the California Court of Appeal's decision was contrary to or involved an unreasonable application of [the United States Supreme] Court's applicable holdings.").

Generally, prosecutorial misconduct claims are cognizable in federal habeas corpus. See Darden v. Wainwright, 477 U.S. 168, 181 (1986); United States v. Young, 470 U.S. 1, 6–8 (1985). The appropriate standard of review is the "narrow one of due process, and not the broad exercise of supervisory power." See Darden, 477 U.S. at 181. A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." See id. Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. See id.; Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).

A prosecutor may not vouch for the credibility of a witness. "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." United States v. Necoechea, 986 F.2d 1273, 1276–79 (9th Cir. 1993) (finding that prosecutorial vouching occurred when a prosecutor referred to facts not in the record). "As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of the government witnesses." Id. at 1276 (citation and internal quotation marks omitted). Such misconduct poses two dangers: it may lead the jury to convict on the basis of evidence not presented, and it "carries with it the imprimatur of the Government." Young, 470 U.S. at 18–19. To warrant habeas relief, prosecutorial vouching must so infect the trial with unfairness as to make the resulting conviction a denial of due process. Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004) (citing Darden, 477 U.S. at 181 (prosecutorial misconduct violates due process when it renders a trial "fundamentally unfair")).

Here, the Court concurs with the California Court of Appeal's analysis and conclusion that Petitioner has not shown that the prosecutor engaged in improper

vouching.  (See Lodgment 62 at 29–34.)  The prosecutor, through Missakian's testimony, did not invoke the prestige of the government to assure Moreno's truthfulness, but instead asked her to describe, in general terms, what must occur before the prosecution enters a cooperation agreement.  (Lodgment 37 at 6186.)  Missakian responded to the prosecutor's questioning by stating that "the prosecution needed to corroborate [Moreno's] statements," explained that corroboration required "finding evidence in addition to or to confirm or corroborate what the client says," and further provided the jury with examples of corroboration.  (Id. at 6187.)  This line of questioning simply informed the jury of the corroboration requirement without suggesting that the prosecutor possessed information outside the record or opined on Moreno's credibility.  See United States v. Tavakkoly, 238 F.3d 1062, 1065 (9th Cir. 2001) (finding that a prosecutor may ask a witness generally about their cooperation agreement with the government).

Petitioner's reliance on United States v. Francis, 170 F.3d 546, 550–51 (6th Cir. 1999) is unpersuasive.  (See ECF No. 20-1 at 14–16.)  In Francis, the prosecutor both tied a sentencing recommendation to a personal belief in the witness's truthfulness and elicited testimony that a plea agreement materialized only after the prosecutor came to believe the witness.  Francis, 170 F.3d at 550–51.  The court found that the conduct directly linked the government's power and the prosecutor's personal assessment to the witness's credibility.  Id.  By contrast, in this case, the prosecutor never suggested that Moreno was truthful based on information outside the record or on a personal credibility determination; instead, the prosecutor merely elicited Missakian's general understanding of corroboration and cooperation agreements without any inquiry as to whether she believed that Moreno was truthful in his testimony.  Accordingly, the prosecutor's examination of Missakian did not constitute improper vouching.

The Court also finds that, contrary to the Petitioner's assertion, the prosecutor did not invoke the prestige of the government to portray Missakian as a "human lie detector" when questioning Missakian about Moreno's obligations under the cooperation agreement.  The prosecutor asked what Moreno's commitments were under the

19cv544-BAS(LR)

cooperation agreement.  (Lodgment 37 at 6192.)  Missakian testified that Moreno was obligated to tell the truth, that failure to do so would void the agreement, and ensured that Moreno understood his obligation to tell the truth.  (Id. at 6192–94.)  Neither the prosecutor nor Missakian opined that Moreno did, in fact, testify truthfully.  Additionally, Petitioner's defense witness, Gloria Collins, likewise testified that cooperating individuals had the obligation to tell the truth, further underscoring that this was a description of standard practice rather than an endorsement of Moreno's credibility.  (Lodgment 36 at 6065–67.)  Thus, the prosecutor did not vouch for Moreno's truthfulness by inquiring into the obligations imposed by the cooperation agreement.  See United States v. Ortiz, 362 F.3d 1274, 1278 (9th Cir. 2004) (finding that there is no prosecutorial vouching by simply eliciting "on direct examination a witness's obligation through a plea agreement to tell the truth"); see also United States v. Daas, 198 F.3d 1167, 1178 (9th Cir. 1999) (finding that there is no prosecutorial vouching when the prosecutor did not make any assurances of veracity, either explicitly or implicitly.).

Moreover, even assuming the prosecutor's questioning was improper, it did not rise to the level of a due process violation.  Generally, prosecutorial misconduct violates due process when it has a "substantial and injurious effect or influence in determining the jury's verdict."  See Ortiz–Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996) (quoting O'Neal v. McAninch, 513 U.S. 432, 443 (1995); Brecht v. Abrahamson, 507 U.S. 619, 631 (1993).  Here, the jury instructions made clear that the jurors retained the duty to assess credibility and corroboration for themselves.  The jurors were instructed that they "alone must judge the credibility or believability of the witness" and they "may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."  (Lodgment 3 at 649–51.)[3]  The jurors were further instructed that they "may

---

[3] The jurors were given the following instruction [No. 105 Witnesses]:

You alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You

use the statement or testimony of an accomplice to convict the defendant" only if "[t]he accomplice's statement or testimony is supported by other evidence that you believe," and that they "should give that statement or testimony the weight [they] think it deserves after examining it with care and caution and in the light of all the other evidence." (Id. at 652–53.)[4]  Under these circumstances, the trial was not so infected with unfairness as to violate due process.  See Necochea, 986 F.2d at 1280–81, 1283 (explaining that vouching errors were mitigated by the court's instructions to the jury); United States v. Velasquez, 665 F. App'x 587, 589 (9th Cir. 2016) (finding that the prosecutor's vouching "was mitigated by a curative instruction, the weight of the evidence in the case, and the lack of

_____

> must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.  You may believe all, part, or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe.
>
> In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.

(Lodgment 3 at 649–51.)

[4] The jurors were given the following instruction [No. 335 Accomplice Testimony]:

> You may not convict the defendants of the charged crimes based on the testimony of an accomplice alone. You may use the testimony of an accomplice to convict the defendant only if:
>
> 1.    The accomplice's testimony is supported by other evidence that you believe;
> 2.    That supporting evidence is independent of the accomplice's testimony; AND
> 3.    That supporting evidence tends to connect the defendant to the commission of the crimes.
>
> . . .
>
> Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence.

(Lodgment 3 at 652–53.)

personal opinion offered by the prosecutor"); see also United States v. Brooks, 508 F.3d 1205, 1211 (9th Cir. 2007) (holding that improper vouching was reduced by the jury instructions directing jurors to scrutinize the credibility of witnesses who had pleaded guilty).

For the reasons set forth above, the state appellate court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Additionally, the state appellate court's decision was not based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Accordingly, the Court **RECOMMENDS** that Petitioner's claim that the prosecutor engaged in improper vouching for the accomplice's credibility be **DENIED**.

**B.    Habeas Relief is Not Warranted with Respect to Petitioner's Claim that there was Juror Misconduct**

**1.    Parties' arguments**

Petitioner argues that he was denied a right to a fair and impartial jury, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution as a result of Juror No. 6's misconduct due to the juror's: (1) association with members of the Arellano-Felix organization and her familiarity with its rival the Los Pallilos street gang, (2) disclosure of this extrinsic evidence during juror deliberations, and (3) statement when she began deliberations indicating a bias against Petitioner. (ECF No. 20-1 at 39.) Petitioner contends that the adjudication of the claim of juror misconduct "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding pursuant to 28 U.S.C. § 2254(d)(2)." (See id. at 41; see also ECF No. 31-1 at 9.)

Respondent argues that the state courts made a factual finding that is supported by the record and, therefore, insulated from challenge. (ECF No. 29-1 at 11 (citing 28 U.S.C. § 2254(d)(2),(e)).) Respondent further asserts that Petitioner does not explain how any misconduct occurring after the verdict could have affected the verdict, as the trial court expressly found. (Id. at 12.) Respondent also contends that, as a legal matter,

the state courts reasonably denied relief. (Id.) Finally, Respondent maintains that the relitigation bar imposes a significant hurdle, such that state-court decisions will generally fall within the range of reasonableness. (Id.)

### 2. Relevant history at trial

Initially, Juror No. 6 was Alternate 4, and on December 10, 2014, the court seated Alternate 4 as Juror No. 6. (Lodgment 4 at 853.) On December 16, 2014, the foreperson (Juror No. 2), informed the court that the jury reached unanimous verdicts on counts five and six (kidnapping and murder), but was deadlocked on counts one through four, and believed that further deliberations would not help reach a unanimous decision. (Id. at 860–70.) The court recorded the verdicts on counts five and six, questioned the jurors about whether further deliberations might assist, and then conferred with counsel in chambers. (Id. at 870–71.) After returning to the courtroom, the court received a note stating that the jurors had deliberated in open court, and Petitioner moved for a mistrial. (Id.) The court directed the jury to resume deliberations while it considered the mistrial motion with counsel. (Id. at 872.) The next day, the court declared a mistrial on counts one through four. (Id. at 886.) After the court recorded its verdicts on counts five and six and while ruling on the mistrial motion, the court received the following Note No. 49 from Juror No. 8 stating:

> We as a jury came to a very hard decision yesterday. When juror #2, the foremen (sic), after our collective judgment, I felt betrayed. I was very upset yesterday, so much so that I question my own partiality. This is not the only time court decorum has been broken. We have been given updates of "Chipo" and other members of "Los Parlios."(sic) After we returned to the jury room, after yesterday's decision, juror #4 stated the were (sic) a baby sitter for the Areliano Felix (sic) family in TJ. Juror #4 qualified it by saying that El Engeniero (Ajustador), and El Tigrillo were to (sic) old for the juror to sit, so the juror never saw them. Juror #4 also stated that their Macro Biology professor (sic) was the mother or aunt of the Areliano Felix (sic) brothers. Juror #4 states that they put this in their "jury form" during the selection process. I'm not saying juror #4 sympathizes with the AFO, but knowing this about juror #4's background makes me very uncomfortable serving with this jury, to the point that it may impair my partiality.

19cv544-BAS(LR)

I'm not trying to get out of this for personal reasons, and my job will support me financialy (sic) for however long this trial takes.  I just don't know if I can bepartial (sic) with such an unprofessional jury, or comfortable with my judgment given that I am sitting on a jury with a person associated with the AFO.

To be clear I have stated on my own jury from (sic) that I had two cousins who were traffickers.  Jose & Hugo Hernandez have served their time & been deported, and I think their sentence was fair.  I was a child when I lived with them, since they stayed with my mother while I attended elementary school in the 80's/90's.  Juror #4 was a baby sitter for the Areliano-Felix (sic) family as an adult, in their own words. (sic).

P.S. I have a nephrology appointment today at 3:50.  I tried rescheduling but the next one is in Feb.  I have 20% kidney function.  So I should not miss any appointments.

(Id. at 886–87.)

After the jury was discharged and as he was leaving, Juror No. 8 submitted another note indicating that he referenced Juror No. 4 by mistake and asked the court to replace all references of Juror No. 4 with Juror No. 6.  (Id. at 887–88.)

### 3.  Analysis

Petitioner raised his juror misconduct claims in a state habeas petition.  (See Lodgment 60.)  The California Court of Appeal ordered the trial court to conduct an evidentiary hearing and to show cause regarding the alleged misconduct.  (Lodgment 68.)  As a result, the trial court held an evidentiary hearing during which nine jurors testified.  (See Lodgments 78–79.)  The trial court issued an order rejecting the petition, the California Court of Appeal adopted the trial court's reasoning, and the California Supreme Court then denied relief.  (See Lodgments 73, 75, 81.)  Petitioner acknowledges that the trial court applied the correct legal standard under clearly established Supreme Court precedent pursuant to 28 U.S.C. § 2254(d)(1), but contends that the decision nevertheless rested on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2).  (ECF No. 20-1 at 44–46.)  Specifically, Petitioner argues that Juror No. 6 exhibited actual bias, and that the trial court reduced the evidentiary hearing

19cv544-BAS(LR)

to a credibility contest between Jurors No. 6 and No. 8 while disregarding the testimony of other jurors.  (Id. at 40.)

Section 2254(d)(2) authorizes federal courts to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." Lockyer, 538 U.S. at 75 (internal citations omitted); see also Torres v. Prunty, 223 F.3d 1103, 1107–08 (9th Cir. 2000) (same standard of unreasonableness applies under subsections (d)(1) and (d)(2)). "[A] determination of a factual issue made by a State court shall be presumed to be correct," and that this presumption of correctness may be rebutted only by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst, 501 U.S. at 805–06.

Here, after an evidentiary hearing, the state trial court reasoned that Juror No. 6 did not commit juror misconduct.  (See Lodgment 73.)  The California Court of Appeal adopted the trial court's reasoning that "Juror No. 6 had not committed prejudicial misconduct and [Petitioner's] counsel was not ineffective for failing to investigate the alleged misconduct and move for a new trial on that ground."  (Lodgment 75 at 3.)  The California Court of Appeal concluded that the trial court's findings were supported by the record, and Petitioner made no persuasive argument for the appellate court to disagree with the trial court.  (Id.)  In the Amended Petition, Petitioner advances the following three arguments that Juror No. 6 was biased: (1) Juror No. 6 concealed a personal relationship with the Arellano-Felix family; (2) Juror No. 6 claimed to possess, and shared with other jurors, information about the Arellano-Felix Cartel and the Los Palillos gang; and (3) Juror No. 6 demonstrated bias by expressing surprise that the jury had not

yet convicted Petitioner. (ECF No. 20-1 at 39–45.) Respondent contends that the state courts' fact findings are supported by the record and therefore undermine Petitioner's arguments. (ECF No. 29-1 at 11.) The Court addresses each of Petitioner's arguments in turn.

### i. Juror No. 6 did not conceal her affiliation with the Arellano-Felix Cartel

Petitioner argues that Juror No. 6's concealment of her personal knowledge of the Arellano-Felix Cartel prevented the defense from exercising either a peremptory challenge or a challenge for cause to remove her during *voir dire*. (ECF No. 20-1 at 39.)

"The Sixth Amendment guarantees a criminal defendant a fair trial. One touchstone of a fair trial is an impartial trier of fact—a jury capable and willing to decide the case solely on the evidence before it." Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (internal quotation marks and citations omitted) (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)). As the Supreme Court recognized in McDonough, "*[v]oir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." McDonough, 464 U.S. at 554. Juror bias can be show in two ways: actual bias, which can occur when a juror intentionally does not answer *voir dire* questions truthfully, and a truthful answer would have led to a successful challenge for cause, or when a juror exhibits a "pre-set disposition not to decide an issue impartially," or implied bias, in which bias can be presumed based on the circumstances. See Estrada v. Scribner, 512 F.3d 1227, 1240 (9th Cir. 2008); Fields, 503 F.3d at 766. "Whether a juror is dishonest [or actually biased] is a question of fact[.]" Fields, 503 F.3d at 767. A defendant's right to a fair trial is violated when a juror fails to honestly answer a question during *voir dire* and a correct response would have led to a successful challenge of that juror for cause. McDonough, 464 U.S. at 556.

19cv544-BAS(LR)

Here, the trial court noted that before trial, all prospective jurors answered the same written questions during *voir dire*. (Lodgment 73 at 4.) Specifically, Juror No. 6 gave the following responses to the relevant questions:

> Question 76: Prior to this case have you ever heard of a group called Los Palillos (the Toothpicks)?
> Answer: No.
>
> Question 84. What do you know if anything about Mexican drug cartels? How do you know this information?
> Answer: I know there is several groups I know because tv news.
>
> Question 85.  Have you heard of the Arellano-Felix drug cartel (AFO, CAF)? If yes, what have you heard?
> Answer: I have heard that some of them have been caught.  When I was in Preparatoria (High School) I had a teacher last name Arellano-Felix.  I don't know if they are related.

(Id.)

At the evidentiary hearing, Juror No. 8 testified that Juror No. 6 stated on multiple occasions that she knew people associated with the members of the Arellano-Felix Cartel. (Lodgment 78 at 282.)  Specifically, Juror No. 8 testified that Juror No. 6 had a "macrobiology" teacher who was an aunt or close relative of the Arellano-Felix Cartel for whom she sometimes babysat. (Id. at 288–89.)  Juror No. 8 testified that these comments were loud enough for the other jurors to hear and became a topic of conversation in the deliberation room.  (Id. at 288, 294–97.)  Juror No. 8 explicitly asked Juror No. 6, in front of the panel, if she put this information in her questionnaire, and she said that she had. (Id. at 283–84, 306–07.)

Juror No. 6 testified that she remembered serving as a juror in Petitioner's case and that she completed the juror questionnaire under oath at the beginning of the trial.  (Id. at 362–64.)  She testified under the penalty of perjury that she answered all questions as completely and truthfully as possible, and did not conceal any information, and explained that she had written that she had a high school teacher named Arellano-Felix, but did not know whether the teacher was related to the Arellano-Felix family.  (Id. at 388–89.)  She

19cv544-BAS(LR)

further testified that she had not remained in contact with the teacher and later realized, in preparing for the evidentiary hearing, that she had been mistaken. (Id. at 366–70.) Her teacher's name was Arellano-Garcia, a conclusion she confirmed by an internet search. (Id. at 366–70, 393.) Juror No. 6 denied ever babysitting for the Arellano-Felix family or telling any juror that she had done so and explained that she worked as a receptionist at a music school where she watched children while her former teacher brought her daughter to class. (Id. at 371–73.)

Juror No. 5 testified that she recalled Juror No. 6 commenting that she had a teacher who might have been related to either the Arellano-Felix or Los Palillos cartel, though she did not remember the exact relationship and thought it might have been an aunt. (Id. at 434–35.) Juror No. 5 believed that Juror No. 6 described only a student-teacher relationship with that teacher, and that Juror No. 6 had disclosed this information on her questionnaire. (Id. at 436.)

Additionally, Jurors Nos. 1, 4, 9, 10, 11 all testified that they had never heard any juror state that he or she had a teacher associated with, or that they had babysat for, the Arellano-Felix Cartel. (Lodgment 73 at 14; see, e.g., Lodgment 78 at 479–81 (Juror No. 1 testifying that s/he did not remember Juror No. 6 saying she had a connection to the Arellano-Felix Cartel); id. at 497–99 (Juror No. 4 testifying that s/he had no memory of Juror No. 6's connection to the Arrellano-Felix Cartel); id. at 466–69 (Juror No. 9 testifying that s/he had no memory of Juror No. 6's connection to the Arellano-Felix Cartel or that she brought in outside information); Lodgment 79 at 557–60 (Juror No. 10 testifying that s/he had no memory of Juror No. 6's connection to the Arellano-Felix Cartel); id. at 566–68 (Juror No. 11 testifying that s/he had no memory of Juror No. 6's connection to the Arellano-Felix Cartel).)

Although Petitioner argues that Juror No. 6 concealed information supporting a challenge for cause, relying on Juror No. 8's account and asserting that it was corroborated by Juror No. 5, (ECF No. 20-1 at 40–41; ECF No. 31-1 at 9), the argument lacks merit. The trial court made a factual finding, supported by the record, that Juror

No. 6 did not misrepresent or conceal material information, and this finding was adopted by the California Court of Appeal. (Lodgment 73 at 17–19; Lodgment 75 at 3.) Juror No. 8 was the only juror who claimed that Juror No. 6 portrayed herself as a babysitter for a teacher tied to the Arellano-Felix Cartel, and the trial court identified three reasons for discounting his testimony: he raised this allegation for the first time in his fifth note to the court (Note No. 49), after being sent back to deliberate following the recording of two verdicts; his evident frustration with being returned to deliberations suggested that his bias toward other jurors affected his recollection; and, despite his assertion that Juror No. 6's comments were loud enough for everyone to hear, no other juror recalled hearing such statements. (Id. at 17–18.)

Petitioner's reliance on Juror No. 5's testimony does not render the state court's factfinding unreasonable. As the trial court observed and the appellate court adopted, Juror No. 5 testified only that Juror No. 6 had a teacher who "may have been related to either the Arellano-Felix or Los Palillos cartel," which is consistent with Juror No. 6's written disclosure that she had "a teacher last name Arellano-Felix" and did not know whether they were related. (Lodgment 73 at 4, 18; Lodgment 75 at 3.) Juror No. 5 further testified that she believed this information had been disclosed on the questionnaire and that she understood the relationship as a student-teacher relationship, not a personal or familial tie that affected her neutrality. (Id. at 18; Lodgment 78 at 434–36.) Petitioner identifies no additional evidence in his federal Petition showing that Juror No. 5 corroborated Juror No. 8's claim that Juror No. 6 babysat for a cartel-connected teacher. (See Lodgment 78 at 436 (Juror No. 5 testifying that Juror No. 6 described only a student-teacher relationship and no other connection).)

Contrary to Petitioner's argument, the record does not show that Juror No. 6 concealed a babysitting relationship with the Arellano-Felix Cartel. Juror No. 6 testified that she worked as a receptionist at a music school for young children, where her teacher's daughter *may have* attended, and did not personally babysit for the family. (Id. at 371.) She further testified that, prior to the evidentiary hearing, she learned that her

29

teacher's name was Arellano-Garcia, not Arellano-Felix. (Id. at 366–70.) On this record, the Court finds that Juror No. 6 did not conceal personal knowledge of, or association with, the Arellano-Felix Cartel beyond what she disclosed on her questionnaire.

Therefore, Petitioner has not shown by clear and convincing evidence that Juror No. 6 concealed information on her questionnaire, as required by 28 U.S.C. § 2254(e)(1). Accordingly, the Court concludes that the state appellate court's denial of this claim was not based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). See Johnson v. Diaz, Case No. 18-CV-1542 JLS (LL), 2020 WL 2218954, at *11 (S.D. Cal. May 7, 2020) (holding that a state court's post-evidentiary-hearing findings were not based on an unreasonable determination of the facts, where a juror failed to disclose her experience as a rape victim). Additionally, the state appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). Accordingly, the Court **RECOMMENDS** that Petitioner's claim that Juror No. 6 concealed her affiliation with the Arellano-Felix Cartel be **DENIED**.

### ii.   Juror No. 6 did not present extraneous information to other jurors

Petitioner further argues that Juror No. 6 was biased because she provided updates during deliberations[5] on the Los Palillos Cartel and reported that one of its prominent members, Chipo, remained at large. (ECF No. 20-1 at 42.)

---

[5] Federal Rule of Evidence 606(b) states: "During an inquiry into the validity of a verdict . . . [a] juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The Court may not receive a juror's affidavit or evidence of a juror's statement on these matters." Fed. R. Evid. 606(b). The Ninth Circuit applies Rule 606(b) to juror declarations in federal habeas proceedings and has instructed that courts may consider only evidence properly admissible under the rule when evaluating allegations of juror misconduct. See, e.g., Fields v. Brown, 503 F.3d 755, 778 (9th Cir. 2007); United States v. Bagnariol, 665 F.2d 877, 884–85 (9th Cir. 1981). "Jurors may testify regarding extraneous prejudicial information or improper outside influences," but not about the deliberative process or the subjective effect of such information. Bagnariol, 665 F.2d at 884–85. Here, Federal Rule of Evidence 606(b) does not bar Juror No. 8's testimony that Juror No. 6

The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence presented at trial. See Turner v. Louisiana, 379 U.S. 466, 472–73, (1965); Grotemeyer v. Hickman, 393 F.3d 871, 876 (9th Cir. 2004). Evidence not presented at trial is deemed "extrinsic." See Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir. 1987). Jury exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment. See Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995).

Similar to his first juror-bias theory, Petitioner relies primarily on Juror No. 8's testimony that Juror No. 6 reported that members of the Los Palillos gang were "free and walking about doing things." (Lodgment 78 at 288, 292, 302–03.) However, the trial court, whose findings were adopted by the appellate court, found that no juror other than Juror No. 8, recalled any juror bringing outside information into deliberations, and concluded that the defense had not shown that Juror No. 6 obtained cartel-related information from extrinsic sources during trial or introduced such information into the jury room. (Lodgment 73 at 21–22; Lodgment 75 at 3.) In his Amended Petition, Petitioner himself acknowledges that "the trial court did not err in finding that this claim in Juror Juror (sic) number 8's note was uncorroborated and not sustained and did not indicate bias by Juror number 6." (ECF No. 20-1 at 43.) Thus, Petitioner both concedes the lack of corroboration and fails to demonstrate that any alleged statements occurred during deliberations on the counts of conviction. See Thompson v. Borg, 74 F.3d 1571,

provided updates about the Los Palillos Cartel during deliberations, because this alleged conduct constitutes possible "extraneous prejudicial information" within the exception set out in Rule 606(b)(2). See Fed. R. Evid. 606(b)(2).

19cv544-BAS(LR)

1574 (9th Cir. 1996) ("Juror misconduct typically occurs when a member of the jury has introduced into its deliberations matter which was not in evidence or in the instructions."). Even assuming Juror No. 8's accounts were corroborated, he testified that Juror No. 6 made the comments the day before, or the day he wrote Note No. 49, after the jury had already reached verdicts on the two counts of conviction. (Lodgment 78 at 292.) Accordingly, any alleged exposure to Juror No. 6's statements could not have had a "substantial and injurious effect or influence in determining the jury's verdict." See Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting Brecht, 507 U.S. at 623).

For these reasons, the Court finds that Juror No. 6 did not present extraneous information to the jury. See Young v. Gipson, 163 F. Supp. 3d 647, 735 (N.D. Cal. 2015) (denying habeas relief where petitioner failed to show that extraneous information affected jurors' verdict). The Court therefore concludes that the state appellate court's finding was not based on an unreasonable determination of the facts pursuant to 28 U.S.C. § 2254(d)(2). Additionally, the state appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). Accordingly, the Court **RECOMMENDS** that Petitioner's claim that Juror No. 6 presented extraneous information to other jurors be **DENIED**.

      **iii.**    **Juror No. 6's statement, "you haven't found him guilty yet?" did not demonstrate actual bias against Petitioner during jury deliberations**

Finally, Petitioner argues that Juror No. 6 demonstrated actual bias when, upon being seated as an alternate, she allegedly asked during deliberations, "You haven't found him guilty yet?" (ECF No. 20-1 at 40.) Juror No. 2, the foreperson, was the only juror who testified that he heard Juror No. 6 make this remark and that, as a result, the jury restarted deliberations. (Lodgment 78 at 513.)

Actual bias is defined as "'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." United States v.

19cv544-BAS(LR)

Gonzalez, 214 F.3d 1109, 1112 (9th Cir. 2000) (quoting United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)).  Actual bias is typically found when a prospective juror states that he can not be impartial, or expresses a view adverse to one party's position and responds equivocally as to whether he could be fair and impartial despite that view.  The determination of whether a juror is actually biased is a question of fact that habeas courts review for "manifest error" or abuse of discretion.  Fields, 503 F.3d at 767.

In this case, Juror No. 2, the foreperson, was the only juror who testified that he heard Juror No. 6 make the remark "he hasn't been found guilty yet?" and that, as a result, the jury restarted deliberations.  (Lodgment 78 at 513.)  The trial court, whose findings were adopted by the appellate court, found that Juror No. 6's alleged statement did not establish bias against Petitioner, reasoning that Juror No. 6 had listened to more than a month and a half of testimony, formed an opinion based on the evidence rather than prejudice, and there was no evidence that she harbored bias or was not open and thoughtful during deliberations.  (Lodgment 73 at 19–20.)  This Court agrees.  Petitioner relies in part on a portion of Juror No. 2's testimony—that Juror No. 6 "had her mind made up prior to sitting down with the other jurors and deliberating"—which was stricken under Cal. Evid. Code § 1150[6], and thus cannot support a finding of bias.  (ECF No. 20-1 at 41; see also Lodgment 78 at 514–16.)

---

[6] Cal. Evid. Code § 1150(a) states the following:

> Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.

Id.  This provision mirrors Federal Rule of Evidence 606(b).  Accordingly, the trial court properly sustained the objection, and this Court cannot consider Juror No. 2's stricken statement.  See Fields, 503 F.3d at 778 ("Juror testimony about consideration of extrinsic evidence may be considered by a reviewing court, but juror testimony about the subjective effect of evidence on the particular juror or about the deliberative process may not.").

Petitioner has not shown, by clear and convincing evidence, that the state appellate court's rejection of this claim rested on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2), (e)(1). Additionally, the state appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). Accordingly, the Court **RECOMMENDS** that Petitioner's claim that Juror No. 6's statement "you haven't found him guilty yet?" demonstrated actual bias against Petitioner during jury deliberations be **DENIED**.

## V. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Amended Petition.

**IT IS ORDERED** that no later than **February 9, 2026,** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 17, 2026**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

Dated: February 2, 2026

_____
Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

34

19cv544-BAS(LR)